2290 John Doe et al. v. Trustees of Boston College et al. Thanks. Good morning. Please the Court, Charles Wayne for appellant. And I'd like to reserve three minutes for rebuttal. You may. Thank you. The fundamental error below is the District Court's use of an improper standard of review, one of extreme deference to a university's handling of a campus sexual assault proceeding. The Court below said that the Court would not second-guess the thoroughness or accuracy of a university proceeding so long as the university complied with terms of its policies. This hands-off approach not only ignores defects in the school's policy, but it's also contrary to this Court's long-standing ruling in the Cloud case from 1983 that courts evaluating disciplinary proceedings on campus may refer, even with regard to private schools, due process principles and evidentiary rules in evaluating the fairness of the proceeding. Well, this is de novo review before us. Correct. So even if you're right about the District Court's application of the standard, and I'm not in any way suggesting that you are, you've still got to convince us that some error occurred that requires us to vacate some portion of this judgment. That's correct. Yeah. So why don't we talk about that a little? I will do that, Your Honor. What was important about the deferential standard of review applied by the Court is it led the Court to engage in improper fact-finding on summary judgment, and this Court reviews summary judgment decisions de novo, as Judge Selya stated. The improper fact-finding, and we've listed this in the brief, had to do with, for example, the prejudicial hearing date. There were the judge held below that forensic tests on John Doe's hands and the enhanced video, an analyzed video, would not have been exculpatory even on a developed factual record. Now that was the same evidence that led the Commonwealth to dismiss all the criminal charges without condition. By holding as it did, the District Court engaged in impermissible fact-finding. Another example of that would be the interference with the Disciplinary Hearing Board during its deliberations. And that was when the deliberations took place on a Friday and on a Monday and over the weekend, there were emails and conversations between the Chair of the Disciplinary Panel and the Associate Dean. And the Chair of the Disciplinary Panel informed the Associate Dean that the Board was troubled by the fact that they needed to see certain evidence. That's the evidence, that's the forensic tests on the hands and the video. And they were troubled by that and they were considering issuing a decision called a no-finding, meaning insufficient evidence, and wondered whether in fact they could do that. And that's in the rules that they're allowed to do that. The Associate Dean then talked to the Dean who said, yes, we have that result, but I discourage it. The Associate Dean reported this conversation back to the Chair of the Hearing Panel saying they discouraged the no-finding. That conduct is which the court below did not have a problem with, that it didn't affect the validity of the result. In a court of law, that would be presumptively prejudicial, tampering with a jury member. Was your client or your client's counsel aware that the hearing tribunal at the Dean's direction had arguably taken the no-finding option off the table? They were not. That did not come out until discovery in this case. So they knew nothing about that. So the second, there was also interference by the University's General Counsel. Now, the court below held, said it remains undisputed that the Board did not contact Mr. Hurley, the General Counsel, until after the Board had rendered a decision. That is not true. What happened was the Board was still in the deliberation room. They called Mr. Hurley on the phone. And Mr. Hurley had his deposition, admitted that he supplied the language that is the linchpin for the decision. At the end of the day, the Board could not believe that this sexual assault took place as alleged. That is a, pardon the language, a digital rape from behind. They could not believe that. Mr. Hurley, he gave them the basis for their decision, which is that although the Board believes that some sort of unwanted touching of a sexual nature took place, it is less likely than not that penetration was achieved. And so Mr. Hurley at his deposition admitted supplying that language. As I said, that is the linchpin of the decision. It is also contrary to the evidence, but it is the linchpin of the decision because it enabled the Board to get past the fact that they could not see the forensic test results, which the State was in the process of preparing that weren't available until months later, or the video. So again, that is the liberation with, excuse me, interference with the deliberative body. And at a minimum, this, at a minimum, there is a disputed fact here. And summary judgment should not have been granted for the school. In fact, on this and all of the breaches of contract that we point out in the brief, summary judgment should have been granted for John Doe. Well, on that, didn't Rivera, on the removing no findings as an option, did Rivera, I understood Rivera offered some explanation in an affidavit for that, that tried to claim that it had not actually been removed in a way that the Board had already decided on this lesser included. Assuming the jury could believe, or not believe, but assuming they could believe Rivera, then how would you get summary judgment? We would get summary judgment because her own emails contradict that position. Yes, it is true that at her deposition, and I believe in an affidavit, she said that yes, they had already reached the decision and were merely calling Mr. Hurley for some sort of assistance. But A, that is not what happened. And B, at a minimum, there is a disputed issue of fact here. Her own emails contradict this. But if there is a disputed issue of fact, you don't get summary judgment. That is correct. As I say, at a minimum, it is an issue for the jury. We believe, though, that the emails show that in fact that the no finding result was in fact under consideration and it was the interference that took that off the table. That is a breach of contract. The Board is required under the school's rules to not only to be impartial, but they are supposed to, quote, deliberate in private. And clearly there can be no interference. And whether we look to those provisions or the global promises, as we say, of due process and fundamental fairness, or the implied covenant of good faith and fair dealing, that conduct violated all of those. And if the court were to find that there was in fact an issue, that it was an issue of fact, then yes, that should go to the jury. Agreed. Let me address, if I might, the basic fairness issue. So under Massachusetts law, the university disciplinary proceedings must be conducted with basic fairness. And this duty, as Judge Saylor articulated in Brandeis, consistent with the law, this duty is separate from and in addition to a school's contractual obligations. The court below erred in holding that basic fairness is not a separate duty. Well, put to one side abstractions. If we look at the contract here, the policies, if we were to assume that the school did follow all of its commitments and followed all of its procedures, what would have been unfair about that? It seems to me nothing in that really your unfairness is simply an additional label you would apply to one of their, what you allege, are branches of their agreement. So, Judge Kayada, in answer to your question, so the fairness test, there are two wings to it, as Judge Saylor held in Brandeis. There's the procedural wing and there's the substantive wing. You just mentioned the procedural wing. Even if they followed their own procedures, there were not reasonable grounds to support the decision, as the university claims. There was an absolute failure of proof, and that's what makes this unfair, substantive. How does this claim of substantive unfairness, which I must confess strikes me as coming somewhere out of the ether, but how does this add anything to your claim for breach of the implied covenant of good faith and fair dealing? I'm not entirely sure that it does. So if it doesn't, we don't have to deal with it, because it is clear that if a breach of contract claim is still alive, and that remains to be seen, that then a potential claim for breach of the implied covenant of good faith and fair dealing is still alive, since Joe Jung dismissed that claim solely on the ground that no contract claims have survived. I agree with that, except it's clear under Massachusetts law that there's an independent claim for breach of the duty of basic fairness. But that's a disputed matter, and I'm trying to get at why we should be wrestling with that, if it adds nothing to the implied covenant of good faith and fair dealing. See, that could be freestanding, if there's no contract at all. So a school can't get away from having to be fair. But if you've got a contract with fair procedures, then why doesn't that swallow up the fairness claim that otherwise would exist? Well, if the procedures are fair, and we did not concede that they were fair, if you don't follow the fair procedures, it's a breach of contract. So just having the procedures isn't good enough. You must follow them. Part of that is having a decision that's supported by the evidence. Here, as I said, there was an absolute failure of proof. And whether we want to say that that's a violation of the contract because there was no preponderance of the evidence, or we want to say it violates basic fairness, or if we want to say there were no reasonable grounds, which is the flip side of the arbitrary and capricious standard of review, which also, as Judge Saylor pointed out, may not be relevant if there, in fact, is a contract, to your point, Judge Kayada, it's all the same. And simply, if there's no proof, the decision cannot stand. One of the claims you make that they didn't follow the procedures was that in the discussion with Hughes, that it wasn't a discussion, it was a one-way conversation, and she did not allow him to explain the third-party culprit defense. Correct. Was there a subsequent point to that where she did learn about J.K. before the hearing and asked for an explanation and then wasn't given it? And how do you fit that in? That occurred, yes. So she found out about J.K. the day before the hearing. She asked John Doe to come in. He said yes, then emailed back and said that his lawyer was not available. And her response was, I don't want to talk to your lawyer. I want to talk to you. And as a result, there was no meeting. And this was the day before the hearing? This was the day before the hearing. And I see my time is up. It is. Good morning, Mr. Lapp. Good morning, Your Honors. May it please the Court, Darrell Lapp on behalf of Boston College and the five individual administrators. This is, at its core, a breach of contract case, as we've already been discussing for a few minutes. And the plaintiff's appellant's arguments essentially amount to the claim that Boston College should have had different procedures than it actually did. I don't think that's really the claim that's being made. One of the times, gentlemen, I've referred to my colleague not because he's older but because I like him. He's not elderly. Well, it depends by whose standards. That's not really the claim. The claim, as I understand it, or at least the parts of the claim that have made an initial impression upon me, goes something like this. There is a student handbook and related documents. The parties concede that those documents form a contract between Doe and Boston College. There are some concrete provisions in those documents. One provision, for example, is that the deliberations of the board will be private. I think the word is that's used. And that the board's options are four spelled out, one of which is to come back with a no-finding decision. There is a factual allegation here, A, that the privacy was breached because during deliberations, Rivera, the board chair, talked with the dean. Hurley may be on a different level because he's counsel for the school, but at least talked with the dean. And the dean discouraged her from having the board consider one of the permitted options, a no-finding, and she reported that back to the board. Allegation, that's a breach both of privacy and it's a breach of the contract which says that no-finding is one of the options. That's the sort of allegation that I wonder why that doesn't create a genuine issue of material fact since there is testimony to back up what I've just said. Well, the answer, Your Honor, I think is this, is that what the trial court did here and what this court and what this court. I don't want to know what the trial court did because it's staying over a review. I want to know why the testimony I've just cited to you doesn't make out a genuine issue of material fact. Because it has to be reviewed in its entirety, not just in the cherry-picking way that my brother has presented it to the court. The evidence that is in the record. Is there something in the record that shows conclusively that a no-finding determination was not taken off the table by the board after the dean discouraged its use? What the record shows very clearly from all of the testimony of all of the witnesses who were involved with the panel's deliberations was that the panel on day one of its deliberations had decided there was evidence from which it could find there was an inappropriate touching of AB. That doesn't begin to answer my question. I'm about to get to part two, Your Honor, if I may. And that what they were struggling with was the question whether there was also evidence to support a finding on the more serious charge of penetration. The emails don't jive up with that. They could be read otherwise. And the fact finder could disagree or not believe this explanation that was being offered here. When you've got a clear instance of the dean saying basically take no finding off the table? Well, that's an argumentative reading of the email. Well, no, it's a reading that is plausible enough. I'm not saying I agree with it. I'm not saying it's correct. But we're under Rule 56 here, and the question is could a reasonable juror look at those emails and say that what basically happened here was one of the four options under the contract, one of the ones that was beneficial to Doe got removed? As to the second charge, arguably, there is no evidence. Well, that's their explanation. But why does a jury have to believe that explanation? There's no document that backs it up. The question at summary judgment, this is not whether there's some minimally plausible allegation that survives a motion to dismiss. We've had complete discovery. There's a fully developed factual record, and the question for the Rule 56 decision is, is there evidence from which a reasonable juror could find in favor of the plaintiff? That's absolutely not the question. That's a question to determine whether a verdict is supportable. But the summary judgment standard is whether the record taken in the light most favorable to the non-moving party, here, Doe, demonstrates that the prevailing party is entitled to a finding as a matter of undisputed fact and as a matter of law. Absolutely correct. A fuller articulation of it, taking the view in the light most favorable to the plaintiff. But the evidence is simply not there to deem that there is a tribal issue of fact here. On the count, on the claim, on the charge, if you will, as to which Doe was found responsible, there is no evidence in the record, Your Honors, that this panel was struggling with or interfered with in relation to the very simple finding that it made of the non-penetrative account. Let's look at the email. I've got one in front of me here. And this is the first email Rivera sent to Hughes, and it says, struggling with needing to see the other evidence. It is not a clear yes for responsible, period. It doesn't say it's not a clear yes for responsible on the most serious charge, but we're all copacetic on at least some charge. She wants to add that, which is not in her email. And so my burden at summary judgment is to demonstrate that there's no issue of tribal fact by presenting evidence that explains a record, that explains what that email means. Once you're into the explaining part of it, you're in trouble on Rule 56, because it's going to be a darn good explanation that would require a jury to believe the explanation, particularly where she sends another email back that says, we are going on the notion not to have no finding. So in both emails, there's zero suggestion that what she's saying is that we have found him responsible on one thing, and we're having trouble on whether we should find him responsible for the full vote. Exactly. The question is, what do those very cryptic emails mean? We develop a factual record in which there is an explanation under oath, which is uncontroverted as to what those emails mean that Rivera provides, and the plaintiff who has the opportunity to depose and did depose Rivera, Hughes, and every single member of that panel. It was the plaintiff's burden to develop some evidence to create a tribal issue of fact, which she was unable to do. I think the proposition that we're disagreeing on is if you have an email that point blank says X, and someone then offers an explanation that really what it says is X with a qualification that I neglected to put in the email because it was just a short email, it was a rush, that that automatically wins summary judgment. That's something that a jury could buy that explanation, but a plaintiff doesn't lose merely because they can't get the person offering the explanation to recant it. I respectfully disagree, Your Honor. The burden is on the plaintiff at summary judgment, as this court has held numerous times to go, and this is true even in cases of discrimination, including employment discrimination cases. The plaintiff has got to go beyond speculation, conjecture, hypothesis, and unsupported inference. The burden is on the plaintiff. But the plaintiff in this case says to a jury, to a fact finder, those two emails mean exactly and precisely what they say. I rest. And you now come in with an explanation. Well, they don't really mean that. They mean that in one sense, but not in another sense. And a jury may believe you, and a jury may say no way. That's an afterthought. That's hindsight. What the plaintiff is asking the court to do is to speculate as to the meaning of these emails and to infer with no basis some nefarious motive on the part of Hughes to interfere, as to which there is no evidence, and that this interference has had an effect on the panel. Let me ask you about the Hughes no evidence, as to Hughes interfering. As I understand the case, the essence of this case, as it developed and as it was heard, was basically it happened, did Doe do it or did J.K. do it? The charge was Doe did it. Doe's defense was J.K. did it. And that was how it shaped up as I read the record. During the proceeding, as I understand it, Hughes told her assistant to tell Rivera, the chair of the board, to put J.K. at ease when he came in to testify. Are you saying that's not interference? I am saying that's absolutely not interference. There is no suggestion that Hughes was trying to sway the opinion of the panel at all. There is no evidence that being put at ease meant anything other than he's to know that, for purposes of this proceeding, he's a witness. He's not being accused in this proceeding. Well, there you go. Well, there you go. The whole defense is that J.K. did it, and the board is being told that the dean who's done the investigation, don't worry, J.K. is not being accused. Presumably, if Hughes thought J.K. was guilty, in other words, Doe was innocent, then J.K. would have stood some chance of being. It just seems a very substantial interference here. Far from substantial interference, it seems a completely innocuous comment as to which there is no evidence that it had any effect. Every one of these panel members was deposed, and evidence was developed and submitted into the record as to what was the basis of their decision, what was the evidence on which they made their findings, and what was going through their minds as they went through their deliberations. There is no evidence that any panel member was swayed in any way by a suggestion from the dean's office that somehow they were not to give full and complete consideration to Doe's defense, whatever it might be. The fact is, there was very clear, ample evidence from which this panel could find and did find that Doe was the one who assaulted A.B., which is reported in our brief. And I submit that what Plaintiff is inviting the panel to do, in the guise of interference, as to which there is no evidence of actual interference, what Plaintiff is inviting the panel to do is to substitute its own weighing of the evidence for the panel's weighing of the evidence. How shall we meet the contract provision that says that Hughes would discuss the allegations with Doe? Number one, she did discuss the allegations. Let me ask you about that. Don't we have to assume, because Doe has testified, as I believe his parents testified, that Hughes refused to hear the J.K. explanation as a third party culprit? That was certainly Doe's testimony. So whether it happened or not, we have to assume that happened. Right. Could a jury find that a discussion in that contract, particularly in the contract of saying that Hughes, at the end of that discussion, would decide whether to drop or proceed with the charges, could a jury find that a discussion as defined in Webster's is sort of a two-way street that she should hear what the defense is before she decides whether to drop or proceed with the charges? I would say no, Your Honor. Why not? The contract language has to be read in its totality and in a way that makes sense. And what the procedures provide is that the dean is supposed to meet with the student and discuss the case without prescribing any particular discussion that needs to happen. And it's undisputed that the discussion included telling him what he was being charged with and over the course of three different meetings, giving him an opportunity to review the statements that were going to be admitted against him, meeting with both him and both of his parents, and explaining how the process was going to go forward. But that's not all the discussion requirement means, because in the same sentence in which the discussion requirement is contained, it goes on to say that as a result of the discussion, the dean may elect to drop the charges, reduce the charges, postpone them, etc. So the clear implication is that on a bare minimum, the dean is going to listen to the accused person's side of the story. Isn't that right? Even if we indulge every inference in favor of the plaintiff here, there's no evidence from which anyone could conclude that it would have made any difference if Dean Hughes had sat there longer and listened to a fuller articulation of why it was that he thought J.K. did it. The policies have to be read in their entirety. They make absolutely clear that the dean has complete discretion to refer the case promptly to a hearing board, which is the proper form for resolving these. And the alternative would be exactly the kind of system that plaintiff says we shouldn't have. But if she'd listened to the explanation, maybe she wouldn't have concluded that she should tell the board that they should put J.K. at ease. There's, again, Your Honor, there is... That our jury could so find. I mean, we're not saying what happened here. We're just trying to say what could a reasonable jury find. And I would conclude, again, with the notion that there is no evidence in the record whatsoever that the panel was aware of or influenced at all by that case. Can you tell me something? Either directly or by implication, either under the contract or the law in cases, is there a duty on behalf of the school to conduct these hearings and investigations in a fair manner? Yes. It's a part of the contract analysis that's well recognized in the SJC and in the circuit. The school has the obligation to substantially comply with its own procedures. No, I want to know if it's a duty to have a fair hearing and investigation. Fair. It has a duty to comply with its procedures, and those procedures must be basically fair. And what basically fair means, including as articulated in the Gorman case that Your Honor participated in, even at a public institution, what fairness means when we're talking about a university is notice of what you're charged with, some meaningful opportunity to tell your side of the story, and an objective decision maker. And it would exclude any outside influences in the decision. And there is no evidence. I didn't ask you whether it happened. I'm asking you whether that would exclude that possibility. If there were actual evidence of actual tampering that had an actual impact on the panel, that would implicate the fairness analysis. But there is not that evidence in this case. What about excluding what could be exculpatory evidence? Could that implicate fairness? The starting point are the First Circuit cases and SJC cases that say it's not for the court to second-guess the panel's decision as to what evidence to admit or not to admit. But more particularly here, there's no evidence that any excluded evidence would have had any impact on the outcome of this case. It was the forensic evidence about blood or the absence of blood on Doe's hands, which had nothing to do with the finding of inappropriate touching without penetration. And it was the argument that the panel should have seen a purportedly enhanced version of a video where they saw the video. There was no evidence as to when the enhanced version was going to be available, which wasn't until a year and a half later. And there's no evidence in the record from which anyone could infer or deduce or find that the enhanced video would have made any difference. But if there were exculpatory evidence which they excluded, that would affect the fairness of the hearing, would it not? If a panel refused to hear exculpatory evidence, that would certainly implicate the fairness analysis. Thank you. Isn't it some indication that something, it seemed odd here, that in a case in which no one, including Doe, challenged the accuracy of the young woman's description of what happened to her, that the board itself at the end pops out with a decision that challenges the accuracy of the young woman's account? That seems rather strange. I think, with all respect, John, I think it makes perfect sense. No one disputed, including Doe, that there was an inappropriate touching of A.B. on the dance floor. She wheeled around and reacted immediately in such a way. Her friend testified to that, and Doe admitted that that happened. Remember, his defense was- Well, but that's the point. Everybody, no one challenged at all her statement in any way as to what happened to her. And yet the board came out and said she was wrong. It didn't quite happen to her that way. It was a less serious thing. I think, to be fair, what they said was they weren't convinced. They weren't saying it didn't happen, but they weren't persuaded by a preponderance of evidence that it did happen. Okay, so if a fact finder like the board could decide that notwithstanding that the only witness testimony was X, that they don't believe that, doesn't it follow that the fact finder at jury here could decide not to believe Rivera or Hughes? I don't see the connection between these two things, Your Honor. Again, the burden on the plaintiff at this point is to come forward with actual evidence, not just a hypothesis that amounts to nothing more than argument. And there is, in fact, no evidence to support the argument that there was tampering with this panel's deliberations. Thank you. Judge DeWayne. To address Judge DeWayne's question, yes, there is a duty to be fair. There's a number of sources for that duty. Here, there's a duty by the contract. As we stated in our brief, there were the four global contractual guarantees of due process and fundamental fairness, and they use the word due process. In addition, the implied covenant of good faith and fair dealing, which we talked about, and the independent common law duty, which we talked about as well, the duty of basic fairness. With regard to Judge Kayada's point, yes, that's correct that the board in the end did challenge A.B.'s. A.B. told a very consistent story. She told a consistent story to the state police, to the Boston College police, to the emergency room physician, and to the school authorities. And at the end of the day, the board impermissibly discounted that version of events and created their own. They rejected A.B.'s evidence. This is what Judge Kayada was getting to. They hypothesized some other unwanted touching, concluded that John Doe was the perpetrator, and they were not permitted to do that on the state of the evidence. There are a number, unless the court has further questions on what we've been talking about so far, I would just mention that there are a number of other stand-alone issues that we've raised, and I would be happy to address any questions about any of those that the panel might have. Then we will rest on our briefs. Thank you. Thank you.